**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **HOPE FOR JUSTICE**<br><br>Plaintiff,<br><br>v.<br><br>**ANDREW "DRU" COLLIE,**<br><br>Defendant. | Civil Action No. |

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff Hope for Justice ("HFJ"), by its undersigned attorneys, states as follows for its Complaint for Injunctive Relief and Damages against Defendant Andrew "Dru" Collie:

**Nature of the Action**

1. This action seeks to prevent and redress ongoing harm caused by a targeted campaign to misappropriate and destroy valuable trade secrets held on Plaintiff HFJ's computer networks. While serving as an executive at HFJ, Collie orchestrated a scheme to steal tens of thousands of valuable donor records for use at a competing non-profit that Collie co-founded and rejoined immediately after resigning from HFJ in May 2023. As part of the scheme, Collie created a "backdoor" that allowed him to access and download confidential donor databases even after he left HFJ.

2. But stealing confidential records was not enough. Collie also maliciously sabotaged HFJ's ability to communicate with its donors by deleting or modifying donor contact information, including the contact information of certain extremely high-net-worth donors.

Through this sabotage, Collie severely harmed HFJ's ability to perform its mission to stop worldwide human trafficking.

3. HFJ is an international non-governmental organization committed to ending worldwide human trafficking. HFJ works across five continents to end human trafficking and modern slavery, including by identifying and rescuing human trafficking victims and helping survivors find housing and secure criminal justice. HFJ's success is made possible only through generous contributions from tens of thousands of donors who comprise a confidential network that HFJ has spent years cultivating and protecting.

4. Collie is a former HFJ Partnerships Development Manager. Starting around January 2023, Collie began a campaign to misappropriate and sabotage HFJ's confidential donor records. While still in a leadership role at HFJ, Collie secretly downloaded over 80,000 donor records to use in subsequent employment positions, including as Director of Philanthropy at Sole Hope, which competes with HFJ for private donations.

5. Collie used his access to HFJ's private network to create a "backdoor" into its donor records by secretly elevating the access privileges of a pseudonymous administrative account (info.us@hopeforjustice.org). Using the new access privileges of the account, Collie repeatedly accessed HFJ's private and confidential donor record system, where he downloaded, modified, and deleted confidential donor records without detection.

6. Collie ended his employment with HFJ on May 30, 2023. But that did not stop his sabotage campaign. Following his departure, Collie continued to access HFJ's donor databases through his backdoor account. For example, in June and July 2023, without HFJ's knowledge, Collie used his backdoor to modify and delete contact information for certain extremely high-value donors. Collie also continued to steal thousands of donor records for use by Sole Hope.

7. An audit of HFJ's donor database, Donorfy, in October 2023 revealed that both during and after his employment with HFJ, Collie stole, modified, or destroyed tens of thousands of confidential donor records. Upon information and belief, Collie took HFJ's donor data for use in connection with his work for Sole Hope, which he rejoined immediately following his resignation from HFJ, as well as other professional fundraising roles. Collie used this misappropriated data to expand a potential donor network and send unsolicited fundraising communications to HFJ's donors.

8. Collie's misappropriation of HFJ's trade secrets and destruction of donor data have caused and will continue to cause HFJ significant monetary and reputational harm. Accordingly, HFJ brings this action to obtain compensatory, exemplary, and punitive damages, as well as injunctive relief enjoining Collie from continuing to obtain or use HFJ's confidential trade secrets.

## Parties, Jurisdiction, and Venue

9. Plaintiff Hope for Justice, a non-profit organization, is a Tennessee corporation with its headquarters and principal place of business in Nashville, Tennessee.

10. Defendant Andrew "Dru" Collie is a natural person who, upon information and belief, resides in Mount Juliet, Tennessee. Until his departure on May 30, 2023, Collie was the Partnerships Development Manager in HFJ's Nashville, Tennessee office.

11. This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1367.

12. This Court has personal jurisdiction over Collie under the United States Constitution and Tenn. Code Ann. § 20-2-222 because he is a resident of Tennessee.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). Collie worked for Hope for Justice in Nashville, Tennessee within this judicial district. A substantial part of Collie's conduct giving rise to HFJ's claims occurred in and around Nashville, Tennessee.

## Factual Allegations

### I. HFJ's Reliance on Private Donors to Fight Human Trafficking

14. HFJ is a non-profit organization that relies on donations from tens of thousands of confidential donors to fight worldwide human trafficking and end modern slavery by identifying victims, supporting survivors, and preventing exploitation. HFJ has a team of 220 people and provides support in Colorado, Florida, Iowa, Louisiana, North Carolina, Tennessee, Texas, Washington, D.C., Australia, Ethiopia, Ireland, Uganda, and the United Kingdom.

15. In 2024, HFJ positively impacted nearly 150,000 individuals worldwide. HFJ's work included reconnecting nearly 1,000 children and teenagers with their families; removing 80 people from exploitation; housing over 1,000 children at shelters that provide education, food, necessities, and trauma-informed care and support; educating nearly 10,000 people at HFJ's Self-Help Groups; providing in-person and online training to nearly 37,000 individuals; and reaching over 33,000 children through child wellbeing club activities and community events.

16. In November 2023, HFJ accepted the "Charity of the Year" award. Nearly 1,000 applicants from 70 countries applied for this award, and HFJ was the only recipient. In addition to being named the overall Charity of the Year, HFJ also won the Diversity, Equity, and Inclusion category.

17. HFJ has spent years developing and cultivating its donor network. Simply put, HFJ would not exist without its donors. HFJ recognizes that donors do not have an infinite amount of resources, and as a result, carefully choose where and to whom they donate. Thus, HFJ's confidential donor network and database of information on the size and frequency of private donations from individuals and organizations across the world are highly valuable.

## II. HFJ's Contractual Restrictions on Confidential Trade Secrets

18. To safeguard its confidential trade secret information from being used for an unauthorized purpose and to protect its investment in cultivating a broad donor network, HFJ maintains donor information on a private, password-protected database called Donorfy. The database includes detailed information about HFJ's donors, including their names, contact information, historical engagement, and monetary contributions. Donorfy can also be used to store and send e-mails.

19. Donor privacy, and the non-disclosure of confidential donor information, is vitally important to HFJ, which would suffer serious monetary and reputational harm by the unauthorized disclosure of confidential donor information.

20. The State of Tennessee recognized the importance of donor privacy in passing the Information Protection Act in 2023, which requires non-profit organizations to maintain a policy that restricts the disclosure of a donor's personal information. *See* Tenn. H.B. 1181; S.B. 73 (2023).

21. To safeguard its donor information, HFJ requires all employees to agree to, execute, and abide by its Code of Conduct. The Code of Conduct incorporates a robust Information Security Policy. Among numerous other requirements, this Information Security Policy (1) requires all donor information to be protected at all times with complex passwords, (2) requires HFJ employees to keep passwords confidential and accounts secure, (3) forbids employees from sharing access to secure accounts, (4) requires employees to "take all necessary steps to prevent unauthorised access to personal information," and (5) requires HFJ to ensure that third-party service providers, including Donorfy, secure and protect confidential information.

22. HFJ further protects the confidentiality of its donor information by requiring employees to execute agreements to keep donor information confidential.

## III. Collie's Employment at HFJ and Involvement with Sole Hope

23. HFJ hired Collie as a Partnerships Development Manager in June 2020. Collie first worked remotely from Oklahoma before transferring to HFJ's Nashville office in or around August 2020. Over the course of his employment, Collie served as HFJ's Senior Philanthropy Manager and Interim U.S. Partnerships Director. Collie left HFJ on May 30, 2023.

24. In 2009, Collie co-founded Sole Hope, a 501(c)(3) non-profit organization. Sole Hope's stated mission is to help those suffering from foot-related diseases, such as jiggers. Collie served as Executive Director of Sole Hope from October 2009 to January 2020.

25. After resigning from HFJ in May 2023, Collie returned to Sole Hope to work as its Director of Philanthropy.

26. During his employment at HFJ, Collie had access to confidential trade secrets, including databases of donor contact information and historical donation records. Collie was aware that HFJ treated donor records as confidential trade secrets and agreed to protect and keep this information confidential.

27. On August 24, 2021, Collie signed the Employee Handbook Agreement and Acknowledgement. Section 2.11 of the Employee Handbook, titled "Confidentiality and Non-Disclosure of Proprietary Information," states:

> It should go without saying that the business knowledge and information that is acquired during employment should stay within the confines of the organization. All properties and trade secrets of the organization are valuable, special and unique assets of the organization. The disclosure of these assets would cause substantial injury and loss of profits and goodwill to the organization. Accordingly, employees must not disclose, use or disseminate any trade secrets to any other person, partnership, association,

> corporation, or other entity, without limitation. Additionally, the expectation of confidentiality applies after the termination of employee's relationship with the organization.
>
> All data, client and prospect lists, programs, software, systems and other records and written material prepared or compiled by employee or furnished to employee during the term of employee's relationship with the organization shall be the sole and exclusive property of the organization. Should the employment relationship be terminated, employees shall return to the organization all trade secrets and other records, computer data and written materials, without limitation.
>
> Trade secrets include, but are not limited to the following: . . . (c) software programs, codes, manuals, user guides, etc. (d) lists of clients and prospective clients . . . (g) compilations of information, records, methods, processes, programs, systems, software and methods of doing business of the organization, (h) financial information of organization, clients and prospective clients, and information which is not generally known to the public or in the industry in which the organization does business or to other persons who can obtain economic value from such information, and the disclosure of any trade secrets to anyone would be detrimental to the interests of the organization.
>
> Any current employee who improperly uses or discloses confidential information will be subject to disciplinary action, up to and including termination of employment. Additionally, any current or former employee who improperly uses or discloses confidential information may be subject to legal action, even if he or she does not actually benefit from the disclosed information.

28. On September 17, 2022, Collie signed HFJ's Code of Conduct. The Code of Conduct states, in relevant part:

> 4.2: I will not use IT equipment, software or email and social media platforms to engage in activity that is illegal under local or international law or that encourages conduct that would constitute a criminal offense. This includes any material that intimidates or harasses any group based on protected characteristics, or encourages extremism.
>
> . . .
>
> 6.1: I will exercise due care in all matters of official business, and not divulge any confidential information relating to beneficiaries,

> colleagues, work-related matters or any sensitive information unless legally required to do so.

29. The executed Code of Conduct incorporated various related HFJ policies, including HFJ's "Information Security" policy. The Information Security Policy provides:

> Hope for Justice handles personal information of donors, supporters and clients, which can include sensitive information. . . . Hope for Justice is committed to respecting the privacy of all stakeholders, to maintaining a secure environment in which to process personal information and to protecting any personal information from outside parties. Employees handling personal information should ensure they . . . Do not disclose personal information unless authorized to do so. . . . Protect personal information. . . . Keep passwords confidential and accounts secure.
>
> . . .
>
> Confidential data might include information assets for which there are legal requirements for preventing disclosure or financial penalties for disclosure, or data that would cause severe damage to Hope for Justice if disclosed or modified.

30. Collie agreed to treat HFJ's donor information as confidential even after the termination of his employment.

31. Collie knew that the misappropriation and destruction of HFJ's donor information directly breached the restrictive covenants governing trade secrets and information security in HFJ's Code of Conduct and Information Security Policy. Collie was also aware that such misappropriation and destruction would cause HFJ substantial injury, including the loss of revenue and goodwill.

32. During his employment, Collie had access to HFJ's donor database, known as Donorfy. As part of his roles as Partnerships Development Manager and Senior Philanthropy Manager, Collie regularly accessed Donorfy from his personal HFJ account.

33. On September 29, 2023, in response to the Donorfy notification that someone had logged into the database from a new device, HFJ learned for the first time that someone accessed

Donorfy through the administrative account that Collie secretly created and kept concealed: info.us@hopeforjustice.org.

34. HFJ's investigation determined that, both during and after Collie's employment, Collie logged into Donorfy through the administrative account and his personal account to download, corrupt, and delete donor information. Collie used this misappropriated information in connection with his own professional fundraising efforts.

## IV. Collie's Misappropriation and Destruction of Trade Secrets

35. On September 29, 2023, HFJ first received notice of any potential wrongdoing when it received a notification from Donorfy that someone had logged into the database from a new device. Before then, HFJ did not know and had no reason to know of the unauthorized access because Collie concealed his activity through the pseudonymous administrative account. After learning about the administrative account, HFJ shut down its access and launched an investigation. Based on HFJ's investigation in October 2023, it learned that from January through September 2023, Collie had used the administrative account to gain access to highly confidential information in Donorfy and performed unauthorized actions, including downloading tens of thousands of donor records and destroying high-value donor information.

36. On January 5, 2023, Collie logged into his personal Donorfy account and downloaded a list entitled "Every Donor Download" that contained approximately 40,872 confidential donor records. The confidential donor records obtained by Collie included:

a. the name of the donor;

b. the donor's personal contact information;

c. the number of historical lifetime donations from each donor;

d. historical lifetime donation amounts;

e. the date and amount of each historical donation; and

f. whether any donations were matching and the amount of any match.

37. On January 31, 2023, Collie logged into his personal Donorfy account to change the privileges of HFJ's administrative account (info.us@hopeforjustice.org) even though there was no legitimate business purpose for Collie to do so. Collie elevated the privileges of the administrative account so that he could continue to access, download, manipulate, corrupt, and delete HFJ's confidential donor information once he departed HFJ and without the activity being traced to his personal account. These changes included:

a. elevating the administrative privileges of the account;

b. assigning the administrative account additional rights to access certain confidential donor databases;

c. modifying the permissions for data lists for the administrative account;

d. allowing the administrative account to access certain specific donor records titled "Financial," "Forms," "data service," and "National Identity"; and

e. giving the administrative account access to the server's dashboard system.

38. Immediately after Collie used his personal account to elevate the administrative account's privileges, Collie logged out of his personal account and logged into the administrative account to test it, and then logged back in to his personal account.

39. In March 2023, Collie removed the "relationship ownership tag" for one of HFJ's key donors.

40. On April 6, 2023, Collie logged into his personal account and downloaded a donor data file titled "All constituents," which generated over 41,000 donor records.



Case 3:26-cv-01394 Document 1 Filed 09/29/26 Page 10 of 28 PageID #: 10

41. On April 13, 2023, Collie logged into his personal account and performed an "Active Regular Givers Download," which generated 1,518 records.

42. On May 1, 2023, Collie submitted his resignation letter to HFJ. Though Collie stated that his last day of employment with HFJ would be May 12, 2023, Collie remained an HFJ employee until May 30, 2023.

43. Collie began his employment with Sole Hope—one of HFJ's competitors—in May 2023.

44. Throughout May 2023, while still an HFJ employee, Collie logged into both his personal account and the administrative account to manipulate, corrupt, and delete donor data. These actions included:

a. changing valid e-mail addresses to invalid e-mail addresses by deleting or adding a single letter to the address;

b. changing valid phone numbers to invalid phone numbers by changing a single digit; and

c. removing relationship ownership tags for various donors.

## V. Collie's Copying and Destruction of Donor Information After Leaving HFJ

45. On June 8, 2023, Collie impermissibly logged into his personal HFJ account and deleted the phone numbers for two donors in HFJ's database.

46. After that, Collie exclusively used the administrative HFJ account for which he had secretly elevated the access privileges to download, change, and delete donor data.

47. From June through September 2023, Collie regularly accessed the administrative HFJ account in secret to download sets of donor data and change and delete the contact information

for various high-value donors, including by changing a single letter or digit on a donor's e-mail address or telephone number. These actions include, but are not limited to, the following:

a. On June 14, 2023, Collie changed a donor's e-mail address by one digit, rendering the e-mail address incorrect.

b. On July 8, 2023, Collie changed a donor's first name and communication preferences.

c. On July 27, 2023, Collie changed a donor's e-mail address by one digit, rendering the e-mail address incorrect.

d. On August 22, 2023, Collie changed a donor's e-mail address by one digit, rendering the e-mail address incorrect.

e. On August 22, 2023, Collie changed a donor's phone number by one digit, rendering the phone number incorrect.

f. On August 29, 2023, Collie deleted a donor record from Donorfy.

g. On September 25, 2023, Collie changed a donor's e-mail address by one digit, rendering the e-mail address incorrect.

h. On July 8, 2023, Collie downloaded a list of "Regular Givers / Guardians – Number" composed of 976 records and redownloaded a list of "Regular Givers / Guardians – Number" composed of 1,624 records.

i. On July 30, 2023, Collie downloaded a list of "Church Constituents" composed of 75 records and a list of "Faith Donor Files" composed of 1,076 records.

j. On September 1, 2023, Collie downloaded a list of "Wealth Screening" composed of 1,985 records.

k. On September 22, 2023, Collie downloaded a list of "Constituents Linked to Break the Cycle" composed of 28 records and a list of "Nashville & Surrounding [Area]" composed of 980 records.

l. On September 29, 2023, Collie gained unauthorized access to the United States partition of HFJ's Donorfy database using the pseudonymous administrative account.

48. During the time Collie performed these unauthorized actions, he served as the Director of Philanthropy for Sole Hope. Upon information and belief, Collie used the donor information he stole from HFJ to solicit donations for Sole Hope. For example, in October and November 2023, individual donors whose information was located in Hope for Justice's donor database began receiving unsolicited e-mails from Collie's Sole Hope e-mail address (dru@solehope.org).

49. Collie's improper misappropriation and destruction of HFJ's confidential and trade secret information have caused, and continue to cause, irreparable harm to HFJ by, among other things, (a) impairing HFJ's goodwill and reputation with its donors and the non-profit community, (b) destroying or disrupting HFJ's donor relationships, and (c) depriving HFJ of fundraising opportunities at a time when economic and inflationary pressure is making it significantly harder for HFJ to meet its mission-critical fundraising goals.

## VI. Parallel Criminal Proceedings and Timeliness of HFJ's Claims

50. On September 24, 2026, the United States Attorney for the Middle District of Tennessee filed charges against Collie for intentionally accessing a computer without authorization and obtaining information from a protected computer for the purposes of commercial advantage

and private financial gain under Title 18, United States Code, Sections 1030(a)(2), (c)(2)(B)(i), and (c)(2)(B)(iii).[1]

51. Prior to the filing of these criminal charges, HFJ cooperated with federal law enforcement investigating Collie's conduct. In order to minimize the risk of causing any interference in the federal criminal investigation, including to avoid premature civil discovery that could compromise the government's investigation, HFJ deliberately deferred filing this civil action.

52. In any event, HFJ's claims are timely. HFJ did not know and had no reason to know of Collie's conduct before its investigation in October 2023 because Collie concealed his conduct through the pseudonymous administrative account. HFJ brings this action within three years of discovering Collie's wrongdoing, within the limitations periods applicable to each claim. Moreover, Collie's fraudulent concealment independently tolls any applicable limitations period.

## Count I: Federal Defend Trade Secrets Act

(For Injunctive Relief and Monetary Damages)

53. HFJ incorporates the preceding paragraphs by reference as though fully stated herein.

54. The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 *et seq*., forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836.

55. Under the DTSA, "trade secret" means

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored,

[1] Information, *United States v. Andrew "Dru" Collie*, No. 3:26-cr-00225 (M.D. Tenn. Sept. 24, 2026).

> compiled, or memorialized physically, electronically . . . or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

*Id.* § 1839(3).

56. Under the DTSA, "misappropriation" means

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake.

*Id.* § 1839(5).

57. Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." *Id.* § 1839(6).

58. By engaging in the above-referenced conduct, Collie has misappropriated HFJ's trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce in violation of the DTSA. The private donor records that Collie misappropriated from HFJ contain non-public personal information provided by private donors or potential donors to

HFJ, as well as compilations of donor transaction information that are used by HFJ to track historical donations and prepare its core fundraising strategies. This information is critical to HFJ's fundraising efforts across the United States and the world and allows HFJ to pursue its mission to end human trafficking.

59. HFJ has expended significant time, effort, and resources to collect, compile, and protect this confidential donor information. The information also derives actual and potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, the public and other non-profit organizations. This is especially true for the historical giving records of specific donors, which HFJ uses to develop efficient fundraising strategies. HFJ collects and compiles donor information through an array of outreach efforts, including by hosting events and conducting online fundraising campaigns. HFJ's extensive database of donor information gives it valuable competitive advantages over other non-profit organizations that compete over the same donations.

60. Because of the high value of its donor information, HFJ has taken reasonable measures to maintain the confidential nature of this information including through confidentiality and non-disclosure provisions in its employment contracts, an information security policy, limits on who may access donor information, and the use of password-protected databases to store confidential information and trade secrets.

61. Collie was aware of, agreed to, and was required to abide by the provisions designed to protect HFJ's confidential information when he misappropriated HFJ's trade secrets by improper means. Collie was aware of and agreed to HFJ's policy to uphold the confidentiality of donor information even after terminating employment.

62. Despite his knowledge that it would breach HFJ's policies, Collie knowingly downloaded and misappropriated HFJ's donor information for use by Sole Hope. To ensure he could misappropriate HFJ's donor information without detection after he resigned his position, Collie secretly and impermissibly elevated the privileges of HFJ's administrative account. After his resignation, Collie continued to misappropriate HFJ's trade secrets without its knowledge or consent for the purpose of benefiting Sole Hope, one of HFJ's competing non-profit organizations.

63. Collie's misappropriation of HFJ's trade secrets has irreparably harmed HFJ and will continue to irreparably harm HFJ. Any economic damages caused by this misappropriation would be difficult or impossible to calculate precisely. Due to Collie's misappropriation of HFJ's trade secrets, HFJ is entitled to recover from Collie actual damages and losses in an amount to be proved at trial.

64. As a direct and proximate result of Collie's wanton and malicious conduct, HFJ is entitled to recover exemplary damages and reasonable attorney's fees under 18 U.S.C. § 1836(b)(3)(C), (D).

65. Due to Collie's misappropriation of HFJ's trade secrets, HFJ is entitled to injunctive relief under 18 U.S.C. § 1836(b)(3)(A).

**Count II: Tennessee Uniform Trade Secrets Act**
(For Injunctive Relief and Monetary Damages Against Collie)

66. HFJ incorporates the preceding paragraphs by reference as though fully stated herein.

67. The Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn. Code Ann. §§ 47-25-1701 *et seq.*, gives HFJ a private right of action against Collie for the "actual or threatened misappropriation" of trade secrets, and provides for both injunctive relief and damages.

68. Under the TUTSA, "trade secret" means

> information, without regard to form, including but not limited to technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tenn. Code Ann. § 47-25-1702(4).

69. Under the TUTSA, "misappropriation" means

> (A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) Disclosure or use of a trade secret of another without express or implied consent by a person who: (i) Used improper means to acquire knowledge of the trade secret; or (ii) At the time of disclosure or use, knew or had reason to know that that person's knowledge of the trade secret was: (a) Derived from or through a person who had utilized improper means to acquire it; (b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (iii) Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake[.]

*Id.* § 47-25-1702(2).

70. Under the TUTSA, "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or limit use, or espionage through electronic or other means." *Id.* § 47-25-1702(1).

71. By engaging in the above-referenced conduct, Collie has misappropriated HFJ's trade secrets in violation of the TUTSA. The private donor records that Collie misappropriated from HFJ contain non-public personal information provided by private donors or potential donors to HFJ, as well as compilations of donor transaction information that are used by HFJ to track

historical donations and prepare its core fundraising strategies. This information is critical to HFJ's fundraising efforts and allows HFJ to pursue its mission to end human trafficking.

72. HFJ uses its trade secrets, including its donor lists, to serve clients throughout the United States, including Tennessee, and in other countries. Collie had access to and used HFJ's trade secrets while working for HFJ in Tennessee, and Collie has misappropriated HFJ's trade secrets in Tennessee, where he currently lives and works.

73. HFJ has expended significant time, effort, and resources to collect, compile, and protect this confidential donor information. The information also derives actual and potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other non-profit organizations. This is especially true for the historical giving records of specific donors, which HFJ uses to develop efficient fundraising strategies. HFJ collects and compiles donor information through an array of outreach efforts, including by hosting events and conducting online fundraising campaigns. HFJ's extensive database of donor information gives it valuable competitive advantages over other non-profit organizations that compete over the same donations.

74. Because of the high value of its donor information, HFJ has taken reasonable measures to maintain the confidential nature of this information including through confidentiality and non-disclosure provisions in its employment contracts, an information security policy, limits on who may access donor information, and the use of password-protected databases to store confidential information and trade secrets.

75. Collie was aware of, agreed to, and was required to abide by the provisions designed to protect HFJ's confidential information when he misappropriated HFJ's trade secrets

by improper means. Collie was aware of and agreed to HFJ's policy to uphold the confidentiality of donor information even after terminating employment.

76. Despite his knowledge that it would breach HFJ's policies, Collie knowingly downloaded and misappropriated HFJ's donor information for use by Sole Hope and his other professional fundraising endeavors. To ensure he could misappropriate HFJ's donor information without detection after he resigned his position, Collie secretly and impermissibly elevated the privileges of HFJ's administrative account. After his resignation, Collie continued to misappropriate HFJ's trade secrets without its knowledge or consent for the purpose of benefiting Sole Hope, one of HFJ's competing non-profit organizations.

77. HFJ has been and will continue to be damaged economically by Collie's misappropriation of HFJ's trade secrets, specifically its donor lists. Any economic damages caused by such misappropriation will be difficult or impossible to calculate precisely. As a result of Collie's misappropriation, HFJ is entitled to recover actual damages and losses and reasonable royalties under Tenn. Code Ann. § 47-25-1704.

78. As a direct and proximate result of Collie's wanton and malicious conduct, HFJ is entitled to recover exemplary damages under Tenn. Code Ann. § 47-25-1704 and its reasonable attorney's fees under Tenn. Code Ann. § 47-25-1705.

79. Due to Collie's actual misappropriation of HFJ's trade secrets, HFJ is entitled to injunctive relief under Tenn. Code Ann. § 47-25-1703.

**Count III: Tennessee Personal and Commercial Computer Act of 2003**
(For Monetary Damages Against Collie)

80. HFJ incorporates the preceding paragraphs by reference as though fully stated herein.

81. The Tennessee Personal and Commercial Computer Act of 2003 ("TPCCA") gives HFJ a private right of action against an individual who (1) knowingly accesses a computer system for the purpose of "causing the computer output to purposely be false for, but not limited to, the purpose of obtaining money, property, or services for oneself or another by means of false or fraudulent pretenses," (2) intentionally performs an act that disrupts a computer system or makes an unauthorized copy of data from a computer or network, or (3) intentionally and without authorization accesses a computer network to maliciously gain access to a computer. Tenn. Code Ann. § 39-14-602(a)(1)(A), (a)(1)(B), (a)(2).

82. HFJ's password-protected donor database, known as Donorfy, is a "computer program" and "computer network" under the TPCCA. *Id.* § 39-14-601(5), (6).

83. During and after Collie's employment at HFJ, Collie knowingly accessed or attempted to access HFJ's computer systems, including Donorfy, for the purpose of obtaining money, property, or services for himself or for the benefit of Sole Hope by means of false or fraudulent pretenses.

84. During and after Collie's employment at HFJ, Collie knowingly accessed Donorfy for the purpose of causing Donorfy's output to purposely be false for the purpose of obtaining money, property, or services for himself or for the benefit of Sole Hope by means of false or fraudulent pretenses.

85. During and after Collie's employment at HFJ, Collie intentionally and without authorization accessed or attempted to access Donorfy for the purpose of maliciously gaining access to computer material or to tamper maliciously with computer security devices.

86. By his actions during and after his employment with HFJ, Collie violated the TPCCA. As a direct, natural, and proximate result of Collie's violations of the TPCCA, HFJ has suffered damages.

87. HFJ is entitled to damages sustained, including lost profits and the costs and fees incurred in investigating Collie's unauthorized access and bringing this action. *Id.* § 39-14-604(a).

**Count IV: Breach of Contract – Code of Conduct**
(For Monetary Damages Against Collie)

88. HFJ incorporates the preceding paragraphs by reference as though fully stated herein.

89. HFJ's Code of Conduct and its policies incorporated therein constitute a valid and enforceable contract between Collie and HFJ.

90. By signing the Code of Conduct, Collie agreed that: "I will ensure that I use Hope for Justice assets and resources entrusted to me in a responsible manner, and will account for all money and property[.]"

91. Collie breached the Code of Conduct by failing to use HFJ's assets and resources in a responsible manner.

92. The Code of Conduct also required Collie to "exercise due care in all matters of official business, and not divulge any confidential information relating to beneficiaries, colleagues, work-related matters or any sensitive information unless legally required to do so[.]"

93. Collie breached Section 6.1 of the Code of Conduct when he downloaded sets of confidential donor information during and after his employment at HFJ, and divulged the information to Sole Hope, one of HFJ's competitors.

94. Collie acted in bad faith and his actions constitute substantial and material breaches of the Code of Conduct.

95. As a direct, natural, and proximate result of Collie's conduct, HFJ has suffered and will continue to suffer damages.

**Count V: Breach of Contract – Information Security Policy**
(For Monetary Damages Against Collie)

96. HFJ incorporates the preceding paragraphs by reference as though fully stated herein.

97. HFJ's Code of Conduct and its policies incorporated therein, including HFJ's Information Security Policy, constitute a valid and enforceable contract between Collie and HFJ.

98. Section 2.0 of the Information Security Policy requires all HFJ employees, in relevant part, to (1) "[h]andle Hope for Justice and stakeholder information in a manner that fits with its sensitivity and classification"; (2) "not disclose personal information unless authorised"; (3) "[p]rotect personal information in line with this Policy"; (4) "[k]eep passwords confidential and accounts secure"; and (5) ensure that HFJ's "systems and any personal information are protected from unauthorised access and improper use."

99. Section 4.0 requires all HFJ employees to protect personal information, stating, "[a]ll personal information stored and handled by Hope for Justice and its Employees must be securely protected against unauthorised use at all times."

100. Collie's actions directly breach the Information Security Policy. Collie impermissibly accessed the HFJ administrative account to falsify, delete, and download donor data.

101. Upon information and belief, Collie disclosed confidential donor information to Sole Hope without authorization.

102. Collie acted in bad faith and his actions constitute substantial and material breaches of the Information Security Policy.

103. As a direct, natural, and proximate result of such and other conduct by Collie, HFJ has suffered and will continue to suffer damages.

**Count VI: Tortious Interference with Business Relationships**
(For Monetary Damages Against Collie)

104. HFJ incorporates the preceding paragraphs by reference as though fully stated herein.

105. Before, during, and after Collie's employment, HFJ maintained business relationships with its donors.

106. At all times during and after his employment, Collie was aware of HFJ's business relationships with its donors. Collie was one of the designated employees with access to HFJ's donor information, and was aware of how to access information on the length of each relationship, the number of donations, the amounts donated, and all confidential information of each donor.

107. During his employment, Collie changed and deleted confidential information—specifically donors' contact information—through improper means with the predominant purpose of disrupting HFJ's business relationships with these donors.

108. After his employment, Collie changed and deleted confidential information—specifically donors' contact information—through improper means with the intent of disrupting HFJ's business relationships with these donors and enriching Collie's employer, Sole Hope.

109. As a result, Collie's actions have interfered with HFJ's existing and future business relationships with its donors. Changing and deleting donor information prevents HFJ from maintaining the valuable relationships with its donors that HFJ spent years building.

**Count VII: Breach of Fiduciary Duty**
(For Monetary Damages Against Collie)

110. HFJ incorporates the preceding paragraphs by reference as though fully stated herein.

111. In his roles as Partnerships Development Manager, Interim Partnerships Director, and Senior Philanthropy Manager, Collie had a fiduciary duty of loyalty to HFJ, which included, but was not limited to, a duty to use HFJ's accounts and systems only for the benefit of HFJ.

112. Collie also had a duty not to engage in unethical behavior. HFJ's employee handbook lists "working for a competitor, sharing information with a competitor, or using confidential information for personal gain," and "[f]alsifying of business records of any kind" as examples of unethical behavior.

113. Collie executed HFJ's Code of Conduct which, in Section 6.1, imposes a duty of loyalty to HFJ. Collie breached his duty of loyalty and fiduciary duty to HFJ by falsifying, changing, and deleting donor information to prevent HFJ from continuing its business relationships with its donors.

114. Collie also breached his duty of loyalty and fiduciary duty to HFJ by downloading HFJ's donor lists and sharing them with HFJ's competitor, Sole Hope.

115. HFJ is entitled to recover from Collie all compensatory and consequential damages resulting from Collie's breaches of loyalty and fiduciary duties, including the monies HFJ paid to Collie during the period he engaged in disloyal conduct. The Court should also require Collie to turn over to HFJ all income and profits Collie has derived from his breaches of loyalty and fiduciary duties.

116. HFJ is entitled to recover from Collie punitive damages insofar as he has breached his duty of loyalty and fiduciary duties to HFJ recklessly, willfully, fraudulently, and intentionally.

**Count VIII: Conversion**

(For Monetary Damages Against Collie)

117. HFJ incorporates the preceding paragraphs by reference as though fully stated herein.

118. HFJ's confidential donor lists are the sole property of HFJ. However, HFJ entrusts certain employees with access to these confidential donor lists in order to maintain relationships with donors and continue to receive crucial donations.

119. During Collie's employment with HFJ as Partnerships Development Manager and Senior Philanthropy Manager, he was authorized to use HFJ's confidential donor lists to contact various donors.

120. During and after his employment with HFJ, Collie falsified, altered, and manipulated certain donors' contact information in an effort to prevent HFJ from being able to contact its donors.

121. Following his resignation from HFJ, Collie was required to return all copies (paper and electronic), files, and downloads containing HFJ's confidential donor information to HFJ. As of the date of filing this Complaint, Collie has not returned the downloaded lists of confidential donor information to HFJ. Rather, Collie has intentionally kept this confidential information for himself without HFJ's consent.

122. Collie has converted HFJ's property by (1) falsifying and altering HFJ's donor information and (2) exercising control over these donor lists to solicit HFJ's donors on behalf of Sole Hope, one of HFJ's competitors.

123. As a direct and proximate result of Collie's conversion of HFJ's property, HFJ has suffered damages and will continue to suffer damages, for which Collie is liable, until the aforementioned property is returned to HFJ.

## PRAYER FOR RELIEF

Plaintiff Hope for Justice respectfully requests that the Court provide the following relief:

a. An order barring Defendant from engaging in the use or disclosure of any donor information and trade secrets misappropriated from HFJ;

b. An order compelling Defendant to identify, sequester, and return all misappropriated donor information and trade secrets;

c. An order entering judgment in HFJ's favor and against Defendant on all causes of action alleged herein;

d. An award to HFJ and against Defendant for compensatory, actual, consequential, incidental, exemplary, and punitive damages;

e. An award of attorney's fees and costs, as well as pre- and post-judgment interest to the extent provided by law; and

f. An award of all other such relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff Hope for Justice demands a jury for all issues so triable.

Dated: September 29, 2026

Respectfully submitted,

*/s/ Harrison Gray Kilgore*

Harrison Gray Kilgore (BPR No. 041842)
**BRADLEY ARANT BOULT CUMMINGS LLP**
1221 Broadway, Suite 2400
Nashville, TN 37203
(615) 252-3584
hkilgore@bradley.com

Adam J. Hollingsworth*
Thomas R. McIver*
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-3939
ahollingsworth@jonesday.com
tmciver@jonesday.com

*Attorneys for Plaintiff Hope for Justice*

* Motion for admission to appear pro hac vice forthcoming